KEYS v. PACE.

1. INSURANCE—AUTOMOBILES—APPLICATION—OPERATOR'S LICENSE.
    Automobile insurer's question in application as to whether applicant's license to operate an automobile had ever been revoked, suspended or refused within the past 3 years bore upon his acceptability as a risk and required an honest answer.

2. SAME — AUTOMOBILES — OPERATOR'S LICENSE — APPLICATION — REFUSAL OF USE.
    Applicant for automobile insurance who gave a negative answer to question in application as to whether his operator's license had ever been revoked, suspended or refused within the past 3 years *held*, to have been guilty of misrepresentation material to the risk and hazard and to justify cancellation of the policy, where it appears applicant had been refused the use of his license for a period of 1 year by recorder's court—traffic and ordinance division following conviction of a traffic violation and had applied for insurance with garnishee and insurer on day license was returned to him.

3. LICENSES—REFUSAL.
    The "refusal" of a license refers to something other than suspension or revocation and embraces the refusal of the use of the license.

4. INSURANCE—APPLICATION—MATERIALITY OF REPRESENTATION.
    The test for determining materiality of fact or matter as to which a representation is made to the insurer by an applicant for insurance is whether a reasonably careful and intelligent underwriter would have regarded the fact or matter communicated at the time of effecting the insurance as substantially increasing the chances of loss insured against so as to bring about a rejection of the risk or the charging of an increased premium.

REFERENCES FOR POINTS IN HEADNOTES
[1, 2, 4, 5, 6] 5A Am Jur, Automobile Insurance § 13 *et seq.*

5. SAME—AUTOMOBILES—APPLICATION—FRAUD.

> An insurer under an automobile insurance policy may generally, avoid the policy or liability thereon if, in procuring the insurance, the insured had misrepresented a fact material to the risk and the falsity of the representation was unknown to the insurer.

6. SAME—AUTOMOBILES—CANCELLATION OF POLICY—WAIVER—FRAUD.

> Insurer under automobile insurance policy, which returned unearned portion of premium shortly after accident in which plaintiff sustained personal injury and property damage did not thereby waive the right to cancel the policy *ab initio* and withdraw its legal representation of insured upon subsequently acquiring information that insured had made a misrepresentation in application in respect to a matter material to the risk.

Appeal from Wayne; Weideman (Carl M.), J. Submitted October 6, 1959. (Docket No. 6, Calendar No. 47,936.) Decided November 24, 1959.

Case by Julia Keys against Robert H. Pace for personal injuries sustained in automobile collision resulted in judgment for plaintiff. Garnishment proceedings instituted against the Detroit Automobile Inter-Insurance Exchange, an insurance carrier which had cancelled policy upon discovery of fraud in defendant's application. Judgment for plaintiff. Garnishee defendant appeals. Reversed and remanded.

*Waldron, Brennan & Maher* (*Thomas E. Brennan,* of counsel), for plaintiff.

*Erickson, Dyll, Marentay & Slocum* (*James R. Daoust,* of counsel), for garnishee defendant.

SMITH, J. The case before us involves the effect, upon a contract of insurance, of a representation made by the applicant to the insurer.

The facts of the case were stipulated. They are as follows:

"On December 3, 1956, the plaintiff, Julia Keys, was the owner of, and a passenger in, a 1951 Ford automobile. On that day, her automobile was struck by another car which was owned by and driven by the principal defendant Robert H. Pace.

"As a result of this collision, the plaintiff suffered considerable personal injury as well as damage to her automobile.

"On the 24th day of May, 1957, the plaintiff instituted her action in the circuit court for the county of Wayne for the recovery of damages against the principal defendant Robert H. Pace, which she alleged to have been caused by his negligence in the above described collision.

"A summons and copy of plaintiff's declaration having been accordingly served upon the principal defendant, a general appearance and answer denying negligence by the principal defendant, were filed in his behalf by Erickson, Dyll, Marentay, VanAlsburg & Slocum, attorneys and counselors, on the 27th day of June, 1957.

"That on or about the 16th day of September, 1957, plaintiff filed her motion in the circuit court for the appointment of guardian *ad litem* for the defendant, it appearing that the defendant was a voluntary mental patient in the Veterans' Hospital in Battle Creek, Michigan, and accordingly, the Honorable Carl M. Weideman, circuit judge, did on the 4th day of October, appoint one Richard R. Kubicki, guardian *ad litem* for the defendant Robert H. Pace.

"In the meantime, and on or about September 19, 1957, the attorneys of record for the defendant filed a motion in the circuit court to withdraw as attorneys for such defendant backed by an affidavit asserting that the answer to question 3 was false and that knowledge of such falsity was acquired subsequent to June 27, 1957. Pursuant to such motion, an order was entered on October 4, 1957, by the Honorable

Theodore R. Bohn, circuit judge, permitting the said attorneys of record to withdraw.

"Thereafter a motion was filed by plaintiff for rehearing of the motion by attorneys of record for the defendant to permit them to withdraw as such attorneys, and on December 13, 1957, an order was entered by the Honorable Theodore R. Bohn, circuit judge, permitting the attorneys of record for the defendant to withdraw from the case but specifically providing that the entry of said order should not be construed to adjudicate, in any way, the liability of the Detroit Automobile Inter-Insurance Exchange, upon the certain policy of insurance which it had issued to the defendant Robert H. Pace.

"Thereafter, plaintiff filed her motion for judgment against the principal defendant and pursuant thereto, the Honorable Carl M. Weideman did enter judgment in favor of the plaintiff and against the defendant in the sum of $9,500 with costs taxed in the amount of $32 on the 13th day of December, 1957.

"Thereafter, plaintiff filed her affidavit for writ of garnishment against the garnishee defendant, Detroit Automobile Inter-Insurance Exchange, and a writ of garnishment was issued from the circuit court for the county of Wayne and duly served upon the said garnishee defendant, pursuant to which the garnishee defendant did, on the 11th day of March, file its disclosure and demand trial of the statutory issue.

"HISTORY OF INSURANCE

"On or about the 27th day of November, 1956, the garnishee defendant, Detroit Automobile Inter-Insurance Exchange, a domestic insurance company, doing business only in the State of Michigan, issued to the principal defendant Robert H. Pace, its policy of automobile liability insurance, being No. 95–27–5040, pursuant to an application for such insurance made by the principal defendant and dated November 27, 1956. A premium therefor was paid to the garnishee defendant. Question No. 3 on such application for insurance was as follows:

" 'Has your operator's license been revoked, suspended or refused within the past 3 years?'

"Principal defendant's answer was 'No.'

"On December 20, 1956, attorneys for plaintiff notified garnishee defendant of their retainer by her, which notice was acknowledged on December 24, 1956.

"On January 30, 1957, the garnishee defendant cancelled the insurance policy of the principal defendant and returned to him the 'unearned' portion of the premium which he had paid for the policy.

"On September 13th, the principal defendant was notified by the garnishee defendant that it considered the policy totally void from its inception because of misrepresentation made by the principal defendant on his application for insurance in his answer to question No. 3, as aforesaid. A check for the 'earned' portion of the premium was tendered therewith to the principal defendant.

### "History of Principal Defendant's Traffic Record

"On July 25, 1955, the principal defendant was found guilty of operating a motor vehicle 50 miles per hour in a 30-mile per hour zone on Van Dyke street in the city of Detroit, by John G. Carney, referee of the Detroit recorder's court—traffic and ordinance division, and placed on 2 years probation; 'no driving and no reporting.'

"In connection therewith, the principal defendant was required to surrender to the clerk of the said recorder's court—traffic and ordinance division, his Michigan operator's license, numbered P 524 767.

"The offense with which the principal defendant was charged was a violation of section 13B of chapter 237 of compiled ordinances of the city of Detroit, and was not, at the same time, a violation of State law.

"On November 27, 1956, principal defendant was returned his driver's license by the said recorder's court—traffic and ordinance division. As stated

above, this was the *same day* on which principal defendant applied for insurance from the garnishee defendant.

"No proceedings have ever been taken by the secretary of State to revoke or suspend the principal defendant's operator's license, nor has the secretary of State ever refused to issue an operator's license to the principal defendant, and no such revocation, suspension or refusal appears on the records of the secretary of State. Neither is it claimed that any such revocation, suspension or refusal was made by anyone other than the said recorder's court—traffic and ordinance division.

"On January 22, 1957, principal defendant was convicted in said recorder's court for reckless driving in connection with the collision of December 3, 1956.

"The practice of both judges and referees of the recorder's court—traffic and ordinance division of placing defendants on 'no driving' probation, and requiring such defendants to surrender their operators' licenses to that court, has long been followed by that court.

"The existence of this practice has been recognized by the secretary of State, and in cases where the secretary of State suspends a license which has already been surrendered to the court, the license is delivered by the court to the department; and in cases where a suspension by the department terminates at a time when such a probationary period has not expired, the secretary of State follows the practice of returning such license to the court.

"Prior to October of 1957, the secretary of State maintained no record of action taken by the recorder's court—traffic and ordinance division, with respect to operators' licenses. Since that time, the said court has notified the secretary of State of licenses surrendered to it."

Upon this stipulation of facts, and after hearing testimony, judgment was entered on the statutory

issue, from which the garnishee defendant appeals. It is contended that when Mr. Pace informed the insurer that his operator's license had not been revoked, suspended, or refused within the past 3 years, he was guilty of misrepresentation, in bad faith, of the true state of facts material to the risk insured.

The position of the appellee on this phase of the case is that the answer was true. It is argued that only the secretary of State may refuse to issue, revoke, or suspend licenses, and that he had not acted in the premises. Moreover, it is asserted:

"That the action of the referee of the recorder's court—traffic and ordinance division in convicting the principal defendant and imposing a sentence of 2 years probation, 'no driving, no reporting,' was totally void for lack of jurisdiction in the referee and because on the face of the purported conviction, there was no authority to impose probation, and because no true probation under the statutes of the State of Michigan was imposed, and that, in any event, no-driving probation does not constitute a suspension of an operator's license within the meaning of the statutes of the State of Michigan or of the insurance application."

The proper interpretation of the question asked with respect to the revocation, suspension, or refusal of the driver's license requires an inquiry into its purpose. The question may have been asked merely that the insurance company might collect statistics for some purpose, or, indeed, as a matter of mere curiosity. If so, the truth or falsity of the answer would have no bearing upon the risk assumed by the insurer. On the other hand, the question may have been asked in order to enable the insurer to decide whether or not to accept the risk. In such event the question is to be construed to require an honest disclosure as to the history of the applicant's license to drive.

It is clear from the record that the information requested was for the purpose of enabling the insurer to appraise the risk it was being asked to take. It was the insurer's belief that "a person's traffic record, and whether or not he has had his license suspended or revoked, indicates the type of a driver that this person is." It was testified that an affirmative reply to the question re suspension or revocation would have debarred the applicant from insurance with this company, even though some technical defense had existed with respect to the suspension.

We think the fair import of the question asked the applicant was as clear to him as it is to us, namely, that what the insurer wanted to know was whether or not the applicant's driving record justified their assumption of liability, for a fee paid, for the possible accidents arising from his driving. It is significant that the applicant did not apply for this insurance during the period he was without a license to drive. He waited until such license had been returned to him and, on the very same day, November 27, 1956, made application for his insurance. What the insurance company was attempting to obtain, in order to appraise its risk, was the fact of revocation, suspension, or renewal, not the validity thereof. There might, it is true, be cases where the asserted invalidity would go to the risk itself, such as a case of mistaken identity. Even in such case, however, complete candor and good faith would demand that the whole story be placed before the insurer for its investigation and appraisal.

Finally, we note, the question asked is itself broader than its discussion up to this point would indicate. It is also asked whether "your operator's license * * * [has been] refused within the past 3 years." This cannot refer to the initial issuance of the license because until then the driver has none. The words "your" license refers to a license once issued, for

only then does it become his, and the word "refused" obviously refers to something other than suspension or revocation. At any rate, that defendant was refused the use of his license by the referee of the recorder's court—traffic and ordinance division, is clear beyond any question, was clear also to defendant, and was never made known by him to the insurer although directly asked.

The general principles applicable hereto are well set forth in 29 Am Jur, Insurance, § 525:

"The generally accepted test for determining the materiality of a fact or matter as to which a representation is made to the insurer by an applicant for insurance is to be found in the answer to the question whether reasonably careful and intelligent underwriters would have regarded the fact or matter, communicated at the time of effecting the insurance, as *substantially increasing the chances of loss insured against so as to bring about a rejection of the risk or the charging of an increased premium.*" (Emphasis supplied.)

As to the effect of such representation, the same work* states as follows:

"A 'representation,' in the law of insurance, is an oral or written statement by the insured or his authorized agent to the insurer or its authorized agent, made prior to the completion of the contract, giving information as to some fact or state of facts with respect to the subject of the insurance, which is intended or necessary for the purpose of enabling the insurer to determine whether it will accept the risk, and at what premium.    *   *   *

"As a general rule, and apart from statute, an insurer which has issued a motor vehicle insurance policy may, in accordance with the principles applicable to insurers generally, avoid the policy or liability thereon if, in procuring the insurance, the in-

---

* 5A Am Jur, Automobile Insurance, § 13.

sured misrepresented a fact material to the risk and the falsity of the representation was unknown to the insurer."

Mr. Justice WIEST phrased the matter well in *Krajewski* v. *Western & Southern Life Insurance Co.,* 241 Mich 396, 403, when, in speaking of a representation made in an application for insurance, he held:

"If the statement was false the applicant for the insurance was well aware of its falsity, and if he stated the opposite of the truth there was an actual intent to deceive.  *  *  *  The statute invoked by plaintiff condones no fraud perpetrated by an applicant in obtaining insurance and whitens no lies inducing acceptance of the risk."

See *Allstate Insurance Co.* v. *Orloff* (ED Mich), 106 F Supp 114.

We conclude in accordance with the foregoing that the applicant, defendant herein, was guilty of misrepresentation material to the risk and hazard.

But, appellee further argues, the insurer has waived the claimed cause of forfeiture, elected, in fact, "to ratify" the policy. This arises from the circumstance, above set forth, that shortly after the accident the insurer cancelled the policy, returning the unearned portion of the premium to the insured. Appellee asserts that at this time the court records "were available" to the insurer and that it "knew or should have known of the claimed cause of forfeiture at the time there was a pro rata cancellation of the policy." The trial court so concluded. The conclusion is not warranted upon the record made. The only direct testimony, in fact, was to the contrary. Appellant's witness Huxley, a representative of the insurer's underwriting department, disclaimed such knowledge, and the insurer's attorney made affidavit that the falsity of the answer to the question concern-

ing the driver's license first came to his attention subsequent to June 27, 1957. What the appellee's arguments respecting waiver, ratification, estoppel and so forth actually boil down to is simply that this Court should say that the occurrence of the accident itself should have put the insurer on notice of possible fraud and caused its search of the court files for past traffic violations. If it had done so, it is said, it would have discovered the falsehood. Should we hold that the mere occurrence of an accident is sufficient to place such a burden on the insurer with respect to each of its thousands of policy holders? Rather, is the insurer not entitled to give credence to its insured's honesty until it has actual notice that he is a scoundrel? Moreover, if inquiry is to be demanded, is it enough to stop with the traffic court? Might not the accident suggest physical or psychiatric defects? Should investigations not also be made of the past hospitalizations of the insured? Where will we say this may stop within the existing economic framework? It is doubtful whether one who deliberately sets out to swindle an insurance company can be prevented from so doing by any such requirement, and it is even more doubtful that there is enough of this practice to warrant the placing upon the insurance business of a requirement so onerous.

The short answer to the arguments of waiver and estoppel is that a litigant cannot be held estopped to assert a defense, or to have waived his right thereto, because of facts he does not know, unless, as a matter of judicial policy, we are ready to say he "should" know them. This we can always do, of course, but there is nothing before us as a matter of fact or of sound policy, to warrant imposition of such knowledge. This is not to say, of course, that one may wilfully close his eyes to that which others clearly see. But nothing of the sort is here before us. In fact, when actual knowledge was gained, the insurer was

not slow to act, cancelling the policy *ab initio* and withdrawing its legal representation of the insured. Such action was well justified.

Reversed and remanded with directions to enter a judgment of no cause for action. Costs to appellant.

DETHMERS, C. J., and CARR, KELLY, BLACK, ED-WARDS, VOELKER, and KAVANAGH, JJ., concurred.